

**IT IS ORDERED as set forth below:**

**Date:  August 11, 2017**

_____

**W. Homer Drake**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF**: | : | **CASE NUMBERS** |
| | : | |
| MEMORY LANE ASSISTED LIVING | : | BANKRUPTCY CASE |
| OF BOWDON LLC, | : | 15-10373-WHD |
| Debtor. | : | |
| | : | |
| | : | IN PROCEEDINGS UNDER |
| | : | CHAPTER 7 OF THE |
| | : | BANKRUPTCY CODE |

# <u>ORDER</u>

The above-styled case, No. 15-10373-whd, filed by Memory Lane

Assisted Living of Bowdon LLC (hereinafter "Bowdon"), is the lead case

of four consolidated cases.  The other three cases are as follows: No.

15-10371-whd, filed by Memory Lane of Bremen, LLC (hereinafter

"Bremen"); No. 15-10372-whd, filed by Memory Lane Assisted Living, LLC (hereinafter "Ocala"); and No. 15-10374-whd, filed by Southeast Senior Management Group, LLC (hereinafter "Southeast").    When discussing the debtors in these cases collectively, the Court will refer to them as the "Debtors."    Unless otherwise noted, citations to the docket in this Order are citations to the docket of the Bowdon case (15-10373-whd).

Two matters are currently before the Court in these cases: (1) the Debtors' Applications for Approval of Employment of Smith Conerly LLP as Counsel for Debtor (*See, e.g.*, Doc. No. 9),[1] and (2) Smith Conerly LLP's Final Applications for Chapter 11 Compensation (*See, e.g.*, Doc.

---

[1] The Debtors filed substantially similar applications to employ in each of the four cases, and this pattern of filing similar papers in each case repeated itself throughout these cases.    Therefore, so as not to clutter this Order with citations to all four records, the Court will only provide citations to the docket of the Bowdon case unless there is a substantial difference between the filing in that case and the filing in the other case or cases.    Also, the reader may assume, unless otherwise noted, that any paper cited in this Order as filed in the Bowdon case prefaced with the "*see, e.g.*" signal has a substantial corollary filed in the other three cases.

2

No. 62)[2].   These matters are core proceedings, *see* 28 U.S.C. § 157(b)(2),

over which this Court has subject matter jurisdiction, *see* 28 U.S.C. §§

157(a), 1334.

## Background

The four cases—Bowdon, Bremen, Ocala, and Southeast—were

filed on February 20, 2015.  Prior to the petition date, the Debtors were

all involved in the senior-care industry.  Bowdon, Bremen, and Ocala

operated facilities in their respective cities (Bowdon, Georgia; Bremen,

Georgia; and Ocala, Florida), and Southeast served as a management

company.   On March 6, 2015, the Debtors, acting as "debtors in

possession," *see* 11 U.S.C. § 1101(1), filed applications seeking the

Court's approval of Smith Conerly LLP (hereinafter "SC") as their

counsel.   The Court did not enter an order on those applications.

---

[2] In the other three cases, the applications were amended, so the Court
addresses here the "Amended Applications" in the Bremen
(15-10371-whd, Doc. No. 71), Ocala (15-10372-whd, Doc. No. 54), and
Southeast (15-10374-whd, Doc. No. 55) cases.

3

Nevertheless, the cases proceeded, though not well.   On June 24,
2015, Guy G. Gebhardt (hereinafter the "U.S. Trustee"), acting United
States Trustee for Region 21, filed motions to dismiss the Debtors' cases.
(*See, e.g.*, Doc. No. 29).   The U.S. Trustee alleged that the Debtors had
failed to fulfill their obligations to file timely monthly reports and made
allegations that the Debtors were engaged in mismanagement of their
estates.   The U.S. Trustee asserted that those monthly reports that were
filed showed "payment of extraordinary management fees; payment of
prepetition debts; payment of expenses or debts of insiders; and transfers
or commingling of funds among affiliates."

On July 7, 2015, Hanimi Challa, a creditor of the Debtors, filed
motions for appointment of a Chapter 11 trustee.   (*See, e.g.*, Doc. No.
36).   Challa maintained that the Debtors' cases were abusive, and he cited
multiple examples of what he termed "fraud and dishonesty" and
"incompetence and mismanagement."

4

On July 29, 2015, the Court entered orders on both the U.S.

Trustee's motions to dismiss and Challa's motions for appointment of a

trustee, and converted all four cases to Chapter 7.   (*See, e.g.*, Doc. No.

40).   James G. Baker (hereinafter the "Chapter 7 Trustee") was appointed

as trustee for all four Debtors on July 29, 2015.

In its order converting the cases, the Court directed all professionals

employed by the Debtors to file applications for final approval of their

fees.   On August 12, 2015, SC filed its applications for compensation in

the four cases.    In its applications, SC requested the following amounts:

- Bowdon: $7,570 in fees and $126.58 in expenses (Doc. No. 62)
- Bremen: $9,683 in fees and $42.43 in expenses (15-10371-whd, Doc. No. 54)
- Ocala: $6,566.50 in fees and $48.20 in expenses (15-10372-whd, Doc. No. 55)
- Southeast: $8,605 in fees and $4.13 in expenses (15-10374-whd, Doc. No. 68)

On August 28, 2015, SC filed supplements to its applications.   (*See, e.g.*,

Doc. No. 68).   In those supplements, SC explained that it did not "double

5

bill" the estates—in situations where it had performed work that had application to more than one of the cases, it divided the time spent equally between each case that benefited from the work.[3]

On September 1, 2015, Hanimi Challa and Jamuna Challa (hereinafter, collectively, the "Challas") filed objections to SC's requests for fees.  (*See, e.g.*, Doc. No. 69).  The Challas argued that SC was not disinterested during its time as counsel for the Debtors because the Debtors had transferred money to each other pre- and post-petition, and because SC had represented John Cheney, the Debtors' sole member, in pre-petition litigation in State Court.  After citing a laundry list of alleged misdeeds in the case, the Challas maintained that SC's representation of all four Debtors and Cheney allowed Cheney "to misappropriate and divert funds from the four businesses with no recourse."  The Challas requested that the Court deny all fees to SC and order SC to disgorge any

---

[3] At the hearing held on May 10, 2017, SC explained that it filed this supplement in response to concerns raised by the U.S. Trustee.

6

funds already received.

SC's fee applications came on for hearing on September 2, 2015. At that hearing, the U.S. Trustee appeared and suggested that the Court reset the matter to December to allow time for a review of SC's conduct. The Court adopted that recommendation, and directed that the parties should report back sometime in December. However, the hearing was not reset to a date certain.

Nevertheless, once again, the case proceeded. On October 7, 2015, the Chapter 7 Trustee filed motions requesting substantive consolidation of the Debtors' cases. (*See, e.g.*, Doc. No. 73). The Court granted that motion on November 5, 2015. (*See, e.g.*, Doc. No. 76). On November 12, 2015, the Chapter 7 Trustee filed a motion to sell his interest in the contracts, personal property, and possessory interests of the Debtors to the Challas. (Doc. No. 78). That motion was granted on December 11, 2015. (Doc. No. 80).

Over a year later, having received nothing from any party concerning SC's outstanding fee applications, the Court entered an order on February 9, 2017, directing the Chapter 7 Trustee to submit a report indicating the status of his investigation.  (Doc. No. 91).  On February 17, 2017, the Chapter 7 Trustee filed a status report.   (Doc. No. 94).   The Chapter 7 Trustee stated that he had administered the assets of the estates and had found multiple instances of transfers of money between the Debtors and transfers made by the Debtors for the benefit of Cheney. The Chapter 7 Trustee stated that the issue of whether SC was representing the Debtors or Cheney was "a valid concern," and suggested the Court schedule a hearing to inquire into the situation.  Finally, the Chapter 7 Trustee noted that the Court never approved the Debtors' applications to employ SC.

After receiving the Chapter 7 Trustee's status report, the Court ordered a hearing and directed the parties to submit any briefs or

memoranda of law they wished prior to the hearing.   (Doc. No. 95).   The Challas were the only party to submit a brief, which they characterized as a Supplemental Objection.  (Doc. No. 104).   In that brief, the Challas made three arguments as to why SC's fee applications should be denied: (1) the Debtors failed to comply completely with an order of the Court directing them to set aside funds as adequate protection (*see e.g.*, Doc. No. 32); (2) the Debtors failed to file monthly reports for July 2015; and (3) SC had engaged in post-conversion negotiations with the Chapter 7 Trustee on behalf of Cheney (or, more accurately, a proposed management company owned by Cheney) concerning the management of the Bowdon facility.  In support of that final contention, the Challas attached the affidavit of the Chapter 7 Trustee that outlined the Chapter 7 Trustee's interaction with J. Nevin Smith, an attorney with SC, on the day after the case was converted.   According to the affidavit, Smith negotiated an arrangement whereby Cheney's management group would

manage the Bowdon facility during the month of August of 2015 for
$17,500, which was over $10,000 more than the management fees for the
Bowdon facility in June of 2015.

The matters came on for hearing on May 10, 2017.  Counsel for SC,
the Challas, and the U.S. Trustee all made appearances, as did the Chapter
7 Trustee.  Counsel for SC first addressed the Debtors' applications to
employ, stating that it was an administrative mistake that they did not
upload a proposed order on the application.  Turning to the fee
applications, he noted that no party apart from the Challas currently
objected to them, and sought to address the Challas' objections.
Concerning the failure to set aside sufficient funds for adequate
protection, he simply stated that SC did not "control the checkbook."  He
then pointed out, correctly, that monthly reports were timely filed for July
2015.  (*See, e.g.*, Doc. No. 59).  Finally, addressing SC's
disinterestedness, he argued that the representation of Cheney pre-petition

was in line with the interests of the Debtors.  Still, he stated that SC would reduce its requested fees and expenses to the amount of its retainers—$3,238 per case.  This would constitute a reduction from the fees and expenses requested of just over 60%.

In support of the objection, counsel for the Challas expounded on the extensive misuse of funds in the cases, and highlighted Cheney's alleged bad conduct.  The Challas argued that SC was under a responsibility either to reign Cheney in or to withdraw from the representation.  They suggested that SC's failure to do so shows that SC was not disinterested.  The Challas also pointed to the large fee SC had negotiated for Cheney's management group after the Court converted the cases.

After hearing the arguments of counsel, the Court requested further briefing within twenty days.  On the Challas' motion, the Court later extended that deadline to June 9, 2017.  The U.S. Trustee, the Challas,

and SC have filed briefs.   Having considered those briefs, the arguments of counsel, and the dockets of the four consolidated cases, the Court concludes as set forth below.

## Discussion

As stated above, there are two matters before the Court: (1) the applications to employ SC as counsel for Debtors; and (2) SC's applications for fees.   Additionally, the Court will address two other issues raised in the parties' filings: the Challas' entitlement to reimbursement of their expenses for bringing their objection, and the treatment of retainers in cases converted from Chapter 11 to Chapter 7.

### A. Applications to Employ

The Court will first address the applications to employ, for if the Court does not approve SC's employment, then it need not consider SC's fee applications.   *See generally* 11 U.S.C. § 330(a) (allowing a court to award reasonable compensation "to…a professional person employed

under section 327"); *Lamie v. U.S. Trustee*, 540 U.S. 526, 529 (2004) (affirming the decision of the United States Court of Appeals for the Fourth Circuit that "in a Chapter 7 proceeding § 330(a)(1) does not authorize the payment of attorney's fees unless the attorney has been appointed under § 327 of the Code"); *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 824 (Bankr. N.D. Ga. 1998) (Massey, J.) ("[Section 330(a)(1)] does not authorize the court to approve compensation from the estate to one not approved by the court under § 327.").

Ordinarily, it would take a showing of exceptional circumstances to allow employment of professionals under § 327 this late in a case: the Court is addressing applications to employ counsel for "debtors in possession" not only over two years after the applications were filed, but two years after the Debtors ceased to be "debtors in possession." *See generally In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. at 824; *In*

13

*re S. Diversified Props., Inc.*, 110 B.R. 992, 996 (Bankr. N.D. Ga. 1990)

(Cotton, J.).

However, this situation is different from the norm. Here, the Debtors did not wait to file their applications until this late hour. Instead, they timely filed applications to employ, but no order was ever entered on those applications. The practice of this Court has been to have parties upload proposed orders on applications to employ for the Court's approval. Despite SC's long history of practice before this Court (including numerous representations of debtors in Chapter 11 cases), neither the Debtors nor SC ever submitted proposed orders, so the applications lay undisturbed and seemingly forgotten. However, this delay does not appear to have been motivated by bad intent. Indeed, given the fact that neither the U.S. Trustee nor any other party in interest ever even raised the issue of SC's employment until the Chapter 7 Trustee did so in his February 2017 status report, the Court will not hold this

14

oversight against the Debtors or SC, and therefore will not hold the applications to the heightened standard as if they were late-filed. *See generally In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. at 823-24 (considering late-filed application to employ). Instead, the Court will address these applications as if it were doing so when the Debtors filed them at the beginning of the case. With that in mind, the Court turns to the applications themselves.

*1. Rule 2014*

Before addressing whether SC meets the requirements of the Bankruptcy Code[4] for employment, it is first necessary to address the form and contents of the Debtors' applications to employ SC to determine if they are procedurally acceptable. To assist courts in evaluating professionals seeking employment by the estate, Federal Rule of Bankruptcy Procedure 2014 requires an application to employ to contain certain disclosures. *See* Fed. R. Bankr. P. 2014(a). Those include "any

---

[4] 11 U.S.C. § 101 *et seq.*

15

proposed arrangement for compensation," and "all of the [professional's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." *Id.* This requires a full and complete disclosure in the application itself—"Bankruptcy courts are not obliged to hunt around and ferret through thousands of pages in search of the basic disclosures required by Rule 2014." *Quarles and Brady LLP v. Maxfield (In re Jennings)*, 199 F. App'x 845, 848 (11th Cir. 2006) (per curiam). Importantly, violating Rule 2014 does not mean an automatic denial of the application. If a party violates Rule 2014, "each Court has an independent duty to fashion the appropriate remedy on a case-by-case basis….There is no simple test to apply[.]" *In re Hutch Holdings, Inc.*, 532 B.R. 866, 881 (Bankr. S.D. Ga. 2015) (second alteration in original) (quoting *In re Sportsman's Link, Inc.*, No. 07-10454, 2012 WL 2998410, at *4 (Bankr. S.D. Ga. July 17,

16

2012)).

The four applications, including the attached affidavits of Mr. Smith, are substantially similar. They all state that SC "has no professional, business, or other connection with the Debtor, its creditors, or any party-in-interest in this case." They also state that SC "represents no interest that would be adverse to the estate of the Debtor in connection with the matters upon which 'SC' is to be engaged." Finally, they disclose that SC has received a retainer and the funds to pay the filing fee.

The Court has two issues with the applications. First—and most glaringly—the applications all state that there is a résumé attached to the filing detailing the terms and conditions of SC's employment, including its hourly rates. The Court has reviewed the dockets of the cases, and there are no résumés. Consequently, the applications, on their face, fail to satisfy Rule 2014 by failing to disclose the proposed arrangement for compensation between the parties.

17

The second issue is that none of the applications mention that SC has represented the sole member of the Debtors in non-bankruptcy litigation, nor do any of the applications indicate that SC is seeking employment in four cases involving debtors who are all affiliated and who have intermingled their funds.   At least one court has found that the failure to disclose these kinds of parallel applications is a violation of Rule 2014. *See In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal. 1988); *see also In re Atlanta Sporting Club*, 137 B.R. 550, 553 (Bankr. N.D. Ga. 1991) (Drake, J.) (noting failure to disclose relationships with affiliated entities).

As mentioned above, failure to comply with Rule 2014 does not result in automatic disqualification.   *See In re Atlanta Sporting Club*, 137 B.R. at 553 ("[T]he Court does not hold that a failure to disclose this information is *per se* grounds for disqualification…."). In this case, the Court does not find that SC deliberately attempted to circumvent the requirements of the Code.   Nevertheless, SC has certainly been careless,

18

even cavalier, concerning compliance with Rule 2014.   For that reason, the Court finds that, assuming the Court awards SC any fees or expenses at all, a severe reduction in the amount awarded to SC is appropriate.   SC has already reduced their requested compensation and expenses by approximately 60%, but the Court finds that a further reduction to $2,000 per case (for a total of $8,000) is appropriate.

*2. Section 327*

Just because the Court has dealt with the procedural aspects of the applications does not mean that SC's employment is approved: the Court must still determine whether SC meets the criteria of § 327.   In a Chapter 11 case, a "debtor in possession" (hereinafter a "DIP") has, with some limitations, the powers of a trustee.   11 U.S.C. § 1107(a).   Included in these is the power to employ professionals.   *See* 11 U.S.C. § 327.   Section 327(a) allows a DIP, "with the court's approval,…[to] employ one or more attorneys."   11 U.S.C. § 327(a).   In deciding which

attorneys to employ, a DIP's choice is limited to attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons." *Id.* This ensures "that all professionals appointed pursuant to [§] 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) (Cyr, J.).

> The Code defines a "disinterested person" as
>
> a person that—(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14). In this case, there is no allegation that SC runs afoul of (A) or (B), so the analysis will focus on (C): an adverse interest. What constitutes "holding[ing] or represent[ing] an interest adverse to the

estate" is not defined in the Code, but courts have defined an adverse

interest as

> possessing, or serving as an attorney for a person possessing,
> either an 'economic interest that would tend to lessen the value
> of the bankruptcy estate or that would create either an actual or
> potential dispute in which the estate is a rival claimant…or…a
> predisposition under the circumstances that render such a bias
> against the estate.'

*In re Hutch Holdings, Inc.*, 532 B.R. at 876 (quoting *Electro-Wire Prods.,*

*Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 361 (11th Cir.

1994)).   As one can see, the requirements that a professional be a

disinterested person and not hold an adverse interest "significantly

overlap."   *Id.*

In the instant case, the Challas have raised two reasons why SC is

not disinterested and should not be employed by the Debtors' estates.

First, they point to the fact that the Debtors were transferring and

intermingling funds among themselves and making payouts to Cheney,

whom SC had represented in state court litigation prior to the petition, and

21

that these could be considered either fraudulent or preferential transfers.
Additionally, the Challas note that SC represented Cheney in negotiations
with the Chapter 7 Trustee after conversion.  Both of these facts, the
Challas argue, suggest that SC was not disinterested and, thus, disqualify
SC from representing the Debtors.

In response, SC argues that § 327 does not bar the representation of
an entity with an interest adverse to the estate, but only the representation
of that interest itself.  Concerning the post-conversion negotiations with
the Chapter 7 Trustee, SC asserts that it was no longer representing the
Debtors at that time, and therefore its representation of Cheney against the
estates in that instance does not undermine its disinterestedness prior to
conversion.

Because the Court is addressing these applications as if it were doing
so when the applications were filed, it is not concerned at this time with
the post-conversion negotiations.  It will take up that issue, if necessary,

when resolving SC's fee applications.   For now, the Court will focus on whether SC's representation of Cheney pre-petition and its representation of the four Debtors at once—the conditions existing at the beginning of these cases—rendered SC non-disinterested to the point that its employment should not be approved under § 327.

The presence of pre-petition transfers between the Debtors, as well as pre-petition payments from the Debtors to Cheney, whom SC represented in state court litigation prior to the petition, complicates matters.   These transfers could potentially be fraudulent or preferential, and, thus, subject to avoidance under the Code.   *See* 11 U.S.C. §§ 544-550.   This is problematic, as an avoidance or recovery action would pit the Debtors' estates against each other and against Cheney.   If SC is allowed to represent the Debtors simultaneously, particularly in actions against a former client, its ability to unbiasedly review the situation could be called into question.   *See In re Jennings*, 199 F. App'x at 849 (quoting

23

the district court) ("The district court affirmed, explaining that these conflicts 'prejudiced the bankruptcy estates that the law firm represented and deprived each of unbiased, independent assessments of the available and outstanding claims.'   Again, we agree.").   Additionally, even if these transfers are not fraudulent or preferential, the simple fact that SC could be in a position to represent both a debtor and a party who owes money to or is owed money by that debtor, suggests an adverse interest. *See Roger J. Au & Son, Inc. v. Aetna Ins. Co. (In re Roger J. Au & Son, Inc.)*, 64 B.R. 600, 605 (N.D. Ohio 1986); *but see* 11 U.S.C. § 327(c) ("[A] person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.").

On that point, SC argues that the mere representation of an entity

24

with an interest adverse to the estate is not disqualifying as long as counsel does not represent that interest.   In support, SC cites to *In re Ellipso*, 462 B.R. 241 (Bankr. D.D.C. 2011), which states that "[t]he Bankruptcy Code does not bar the representation of an entity with an interest adverse to the estate but, rather, the representation of *an interest* adverse to the estate." *Id.* at 251 (emphasis in original).   This interpretation comports with a narrow reading of § 327 which prohibits only the "hold[ing] or represent[ing] [of] *an interest* adverse to the estate."   11 U.S.C. § 327(a) (emphasis added).   The Eleventh Circuit has not interpreted § 327(a) so narrowly.   *See In re Prince*, 40 F.3d at 361.   As stated earlier in this Order, the circuit court has defined "interest adverse to the estate" to include "possessing, *or serving as an attorney for a person possessing*," such an interest.   *In re Hutch Holdings, Inc.*, 532 B.R. at 876 (emphasis added) (quoting *In re Prince*, 40 F.3d at 361).

Accordingly, the prior representation of an insider of the debtor or

representation of related bankruptcy estates can be grounds for disqualification. *See In re Jennings*, 199 F. App'x at 849 (discussing conflicts of interest preventing counsel from representing debtors in consolidated Chapter 11 cases); *In re Atlanta Sporting Club*, 137 B.R. at 552 ("[The prior representation of a general partner] clearly indicates an adverse interest to the debtor…on the part of counsel…."). However, in such situations, there is, once again, no *per se* rule requiring disqualification of counsel. *Cf. In re Hutch Holdings, Inc.*, 532 B.R. at 877. Instead, a court should adopt a "flexible approach" and "determine if there is an actual conflict." *See In re Waterfall Village of Atlanta, Ltd.*, 103 B.R. 340, 344 (Bankr. N.D. Ga. 1989) (Cotton, J.); *see also* 11 U.S.C. § 327(c).

The Eleventh Circuit applies a two-part test to determine whether a lawyer should be disqualified from a representation: (1) "at least a reasonable possibility that some specifically identifiable impropriety did

26

occur"; and (2) "the likelihood of public suspicion or obloquy outweigh[]
the social interest which will be served by a lawyer's continued
participation in a particular case." *In re Waterfall Village of Atlanta,
Ltd.*, 103 B.R. at 344 (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 752
F.2d 1193, 1210 (11th Cir. 1985)).   Another judge of this District has
explained that this test required a court to determine whether an actual
conflict of interest occurred and whether the appearance of impropriety
outweighed the debtor's interest in counsel of its choosing.  *See id.* at
344-45.   The distinction between actual and potential conflicts is critical,
as a *potential* conflict of interest "generally is not disqualifying as long as
no *actual* conflict of interest develops."   *Id.* at 345 (emphasis in original).
But if there is an *actual* conflict of interest, a court must disqualify
counsel.  *In re Hutch Holdings, Inc.*, 532 B.R. at 876.   Whether a
conflict is actual or potential is for the Court to decide.  *See In re
Waterfall Village of Atlanta, Ltd.*, 103 B.R. at 345 (quoting *In re Martin*,

27

817 F.2d 175, 182 (1st Cir. 1987) ("It is for the court to decide whether the attorney's proposed interest carries with it a sufficient threat of material adversity to warrant prophylactic action (say, disqualification or disgorgement or invalidation of a lien).")).

Certainly the conditions here raise at least the potential for conflict—the interrelatedness of the Debtors, combined with Cheney's interest as sole member of all of them, creates a perfect storm of potential conflict that SC attempts to weather.   But the Court finds that these are potential conflicts, and do not rise to the level of actual conflict sufficient to deny the applications to employ.   While there are indications of misconduct pre-petition, no party has suggested any specific circumstance constituting an actual conflict of interest that existed when these applications were filed.   The Court could deny the applications given the potential for conflict existing even at the beginning of this case, but it will not do so.   The Court finds that, in this case, the better course is a "wait

28

and see" approach—if actual conflicts arise, SC must either withdraw or

face disqualification.[5]   Consequently, the Court will approve the

Debtors' applications to employ SC.

## B. Final Applications for Chapter 11 Compensation

Of course, getting its employment approved is merely the first

hurdle for SC to clear—the Court must now decide whether, during the

course of SC's representation of the Debtors, SC remained

"disinterested."   Section 328(c) provides,

> [T]he court may deny allowance of compensation for services
> and reimbursement of expenses of a professional person
> employed under section 327 or 1103 of this title if, *at any time*
> *during such professional person's employment* under section
> 327 or 1103…, such professional person is not a disinterested
> person, or represents or holds an interest adverse to the interest
> of the estate with respect to the matter on which such
> professional person is employed.

---

[5] The abnormal procedural history of this case forces the Court to engage
in a legal fiction.  The Court understands that it is impossible to "wait
and see" what will happen in the past, but the best way to analyze these
applications is to pretend the Court is doing so at the time the case was
filed.  The Court will discuss whether any of these potential conflicts
developed into actual conflicts in Part B, *infra*.

11 U.S.C. § 328(c) (emphasis added).   Thus, even though SC may have only faced potential conflicts of interest at the beginning of the Debtors' cases, if an actual conflict ever arose, the Court would be empowered to deny SC its fees and expenses.

As an initial point, the Court notes that the concerns over the transfers between the Debtors and Cheney never blossomed into actual conflicts.   Though the Debtors did not pursue avoidance actions against each other or against Cheney, this is not sufficient, on its own, to call SC's disinterestedness into question.   Instead, this failure "at best…raises questions of business judgment," and the Court will "not interfere with such business judgment absent bad faith or abuse."   *See In re Waterfall Village of Atlanta, Ltd.*, 103 B.R. at 346.   Here, the Court does not find that SC has acted with bad faith or abusively in decisions concerning the pursuit of these transfers.

In addition to the transfers, the Challas raise two points concerning

SC's non-disinterestedness during the case.   First, the Challas argue that SC was complicit in the mismanagement that lead to the conversion of the cases to Chapter 7.   They argue that SC should have withdrawn from the representation or done something to stop Cheney.   Second, the Challas maintain that SC's representation of Cheney post-conversion was adverse to the estate.

Concerning the post-conversion negotiations, the Court agrees, to a point, with the Challas.   SC, by negotiating a management deal on behalf of Cheney with the Chapter 7 Trustee, was representing an interest "adverse to the estate"—the amount of payment Cheney's management company would receive from the estate was certainly "an economic interest that would tend to lessen the value of the bankruptcy estate."   *See In re Prince*, 40 F.3d at 361.   However, as SC correctly argues, SC no longer represented the Debtors (most importantly Bowdon, whose facility was the one in need of management) at the time of those negotiations

because the conversion of a Chapter 11 case to Chapter 7 "terminate[s] [the debtor's] status as debtor-in-possession and so terminate[s] [counsel's] service under § 327 as an attorney for the debtor-in-possession." *See Lamie*, 540 U.S. at 532. SC was no longer employed under § 327 from the moment the Court entered its order converting the cases to Chapter 7, and therefore SC's conduct after conversion does not directly implicate § 328. *See* 11 U.S.C. § 328(c) (allowing a court to disallow fees if counsel became non-disinterested or took or took a position adverse to the estate "at any time *during such professional person's employment under § 327*." (emphasis added)).

Nevertheless, the fact that SC pivoted so quickly from representing the Debtors to representing Cheney raises serious concerns about SC's conduct prior to conversion. That SC could so seamlessly transition from its responsibilities to the Debtors to advocating for Cheney against the Debtors implies that SC was acting for Cheney, rather than the Debtors,

32

all along.

This leads the Court into considering SC's complicity in the mismanagement of the Debtor.   As a starting point, the Court acknowledges that misbehavior in the management of a debtor by a principal is generally not sufficient to warrant denial of fees and expenses to debtor's counsel.   If it were, it would be the rare Chapter 11 counsel that ever got paid when the case converted to Chapter 7 (or when a Chapter 11 trustee was appointed).   *See* 11 U.S.C. § 1112(b). Nonetheless, there can be situations in which a principal's bad acts could be attributed to counsel, such as if counsel advised the principal to take the wrongful actions, or if counsel actively colluded with management to undermine the estates.

SC's conduct post-conversion—negotiating what appears to be an exorbitant fee for Cheney's company against one of the Debtors—suggests that SC may have fallen into this latter category of

cases involving bad faith.   However, neither the Challas nor any other party in interest have pointed to any particular action taken by SC while the case was in Chapter 11 that would lead to the conclusion that SC was actively colluding with or assisting Cheney in undermining the Debtors' estates.   SC's conduct post-petition, while certainly in bad taste, does not convince the Court that SC lacked disinterestedness while it was employed under § 327.

Consequently, the Court finds that SC remained disinterested during the pendency of the Debtors' cases, and, therefore, SC's request for fees and reimbursement of expenses will be granted, subject to the reduction discussed above.

## C. The Challas' Expenses

In their objection, the Challas request that the Court award them the costs of prosecuting their objection pursuant to § 503(b)(3)(B) and § 503(b)(3)(D).   Section 503(b)(3)(B) allows a court to award expenses

34

incurred by "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B).   Section 503(b)(3)(D) allows a court to award expenses incurred by "a creditor…in making a substantial contribution in a case under chapter 9 or 11 of this title."   11 U.S.C. § 503(b)(3)(D). These awards are "administrative expenses," *see* 11 U.S.C. § 503(b), which are entitled to priority in the Chapter 7 distribution scheme, *see* 11 U.S.C. § 726(a); *see also* 11 U.S.C. § 507(a)(2).

Here, pretermitting whether the Challas recovered any property "transferred or concealed by the Debtor," they are not entitled to any award of expenses under paragraph (B) because they did not obtain prior Court approval before proceeding with their objection.   *See* 11 U.S.C. § 503(b)(3)(B) (allowing fees for recovery obtained "after the court's approval"); *In re Engler*, 500 B.R. 163, 173 (Bankr. M.D. Fla. 2013) ("[T]he Court concludes that the creditors were required to obtain prior

court approval before they are entitled to an administrative expense claim under § 503(b)(3)(B)."); *In re Spencer*, 35 B.R. 280, 282 (Bankr. N.D. Ga. 1983) ("[B]ecause in the instant case the applicant did not seek prior approval, it is not entitled to such recovery…."). Neither are they entitled to recover under paragraph (D). These cases were converted to Chapter 7, and the award of expenses under paragraph (D) is not available in Chapter 7 cases—"the 'substantial contribution'…must occur 'in a case' under chapter 11 [or chapter 9]." *See Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 945 (3rd Cir. 1994); *accord In re Engler*, 500 B.R. at 174. In that vein, the Third Circuit Court of Appeals has held that "[e]xpenses incurred after a chapter 11 case is converted to one under chapter 7…are not recoverable pursuant to [§ 503(b)(3)(D)]." *Lebron*, 27 F.3d at 945; *but see Mediofactoring v. McDermott (In re Connolly N. Am., LLC)*, 802 F.3d 810, 819 (6th Cir. 2015). This Court agrees. In the instant cases, the Challas did not raise any issue concerning SC's conduct (or its fees),

36

until after the cases entered Chapter 7.   Therefore, they are not entitled to expenses under paragraph (D).

## D. Disgorgement of Retainer

In his brief, the U.S. Trustee discusses at length the issue of disgorgement of retainers held by Chapter 11 counsel when a case is converted to Chapter 7 and is administratively insolvent.   However, at no point does the U.S. Trustee request disgorgement or even assert that the estates in these cases are administratively insolvent.   Consequently, the Court will not address the issue here, but will allow those parties with standing to do so to file objections to SC's application of the retainers to its awards.   If objections are filed, the Court will entertain the issue at that time.

## CONCLUSION

In accordance with the foregoing, it is hereby **ORDERED** that the Debtors' Applications for Approval of Employment of Smith Conerly

LLP as Counsel for Debtors are **GRANTED** *nunc pro tunc* to the filing of the Debtors' cases.

    **IT IS FURTHER ORDERED** that SC's Final Applications for Chapter 11 Compensation are **GRANTED IN PART AND DENIED IN PART**.  SC is awarded $2,000 as compensation and reimbursement of expenses in each of the four cases, for a total of $8,000.   If a party objects to SC's applying its retainers in satisfaction of that amount, such party must file an objection with the Court and serve it on the U.S. Trustee and the Chapter 7 Trustee within fourteen (14) days of the entry of this Order. If no objections are filed in that time, SC may apply its pre-petition retainers and shall disgorge the surplus to the Chapter 7 Trustee.

    The Clerk is **DIRECTED** to serve this Order on the Debtors, SC, the U.S. Trustee, the Challas, the Challas' counsel, and the Chapter 7 Trustee.

**END OF DOCUMENT**
